# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. JKB-23-0056 |
| | : | |
| BRANDON CLINT RUSSELL, | : | |
| Defendant. | : | |
| | : | |
| | : | |

...oOo...

## GOVERNMENT'S MOTION FOR PROTECTIVE ORDER
## REGARDING UNDERCOVER WITNESSES

The United States of America, by its undersigned attorneys, hereby moves for the entry of a protective order in order to protect the true identities of three undercover witnesses that it expects to call at trial. The requested order is necessary to protect the safety of the witnesses and their families and to preserve the ability of the witnesses to participate in undercover capacities in other investigations. In support of this motion, the government submits the following:

## PROCEDURAL BACKGROUND

The defendant, Brandon Clint Russell, is charged in a one count Indictment with conspiring with Sarah Beth Clendaniel to attack electrical substations in Maryland in violation of 18 U.S.C. § 1366(a). Clendaniel has pled guilty and is scheduled to be sentenced on September 3, 2024. Trial against Russell is scheduled to begin on July 9, 2024.

On June 27, 2023, the Court granted the government's sealed *Ex Parte* Motion for an Order Permitting Delayed Production of Certain Discovery. Pursuant to that order, the government was permitted to delay production of the discovery, which consisted of additional statements of the

1

defendants, until two months before trial. One of the reasons that the Court found for granting the motion was that disclosure of the discovery prior to two months before the trial could endanger the safety of witnesses. In its *Ex Parte* Motion, the government also reserved the right to seek a further protective order, if needed, for security measures to protect against the disclosure of the true identities of one or more witnesses who may testify at trial.

On December 6, 2023, defendant Russell filed a Motion to Compel Disclosure of Identities of Confidential Participants, along with two other pretrial motions. ECF 64. On December 13, 2023, the Court conducted a telephone scheduling conference at which time the Court granted the Motion to Compel Disclosure of Confidential Participants and ordered the government to disclose the witness identities on or before June 18, 2024. ECF 67.

On May 8, 2024, the government produced the discovery that was the subject of its *Ex Parte* Motion. After obtaining the Court's permission (ECF 89), the government disclosed the existence of the June 27, 2023 Order by providing a redacted copy of the Order to the defense the following day.

Now that the existence of the Court's order permitting the delay of certain discovery to protect witness safety has been disclosed to the defense, and the discovery itself has been produced, the government hereby seeks a protective order that would permit it to: 1) withhold from discovery the true identities of three undercover witnesses that it expects to call at trial; and 2) impose certain security measures at the trial, including allowing the three witnesses to testify under pseudonyms, in order to protect their safety and preserve their ability to participate in other investigations.

## RELEVANT FACTS

The government expects to introduce evidence at trial that defendant Russell is a racially and ethnically motivated violent extremist ("RMVE"). He regularly communicated with other RMVEs who are driven by a belief in the superiority of the white race over a loose network of Telegram broadcast channels and chat groups known as the Terrorgram Collective.[1] The Terrorgram Collective functions as an ideological hub where the RMVEs cooperatively and anonymously distribute violent extremist materials online with the intent to persuade others to commit violent acts in furtherance of the RMVE ideology. This content is centered around the concept of accelerationism, which is a belief that the existing state of society is irreparable and that the only solution may be found in the destruction and collapse of the "system." Consequently, these RMVEs solicit and promote violence in order to achieve societal collapse.

The Terrorgram Collective has produced and distributed at least three publications on Telegram and other online platforms. The publications are overtly violent in nature and attempt to incite others to commit attacks on law enforcement, racial and ethnic minority groups, government officials, and critical infrastructure, including electrical substations. Prior to his arrest in this case, Defendant Russell posted several of those publications online, claiming that he participated in the creation of one or more of them, and encouraged others to read the publications.

As part of the investigation that resulted in the charge against the defendant, a confidential human source ("CHS #1"), using an alias, engaged in online and telephone conversations with both Russell and Clendaniel regarding their plan to attack the electrical substations from about

---

[1] Telegram is an online application that provides its users with end-to-end encryption of messages, both written and oral. Telegram is not a United States company nor are its servers located in the United States.

January 12, 2023, until early February 2023. Neither Russell or Clendaniel ever met CHS #1 in person, nor did they ever see any visual depiction, such as a photograph or video, of CHS #1.

In addition to the specific conversations regarding the plan to attack electrical substations in Maryland, the government expects to introduce evidence that CHS #1 engaged in multiple other communications online with Russell and participated in online chat groups with Russell and others in the Terrorgram Collective. A number of those conversations included explicit postings and comments by Russell in which he encouraged and directed CHS #1 and others to attack the power grid to further his accelerationist goals. For example, in October 2022, Russell forwarded to CHS #1 a video about how Mylar balloons can be used to "short transformers and melt wires…" Russell then gave instructions and encouragement to CHS #1 to attack electrical transformers and about the concept of a cascading failure, stating, among other things, that "[p]utting holes in transformers is the greatest thing someone can do," and "center mass bigger more penetrating round the better."

Russell also participated in various online chat groups in which another confidential human source ("CHS #2"), using an alias, participated. The government expects to call CHS #2 to testify about several postings and comments made by Russell in those chat groups in which Russell encouraged others to attack the power grid. The government will offer this evidence pursuant to Federal Rule of Evidence 404(b). Russell never met CHS #2 nor did he ever see any visual depictions of CHS #2.

The third undercover witness that the government expects to call at trial is an FBI online covert employee ("OCE"). The OCE engaged in online conversations with Russell and participated in various chat groups using an alias. The OCE witnessed various comments and postings by Russell in which he encouraged attacks on the power grid. For example, in a direct conversation between the OCE and Russell in August 2022, Russell gave the OCE specific instructions and

advice on how to use Mylar balloons to conduct an attack on electrical infrastructure. As with CHS #2, the government plans to offer this evidence pursuant to FRE 404(b). Russell never met the OCE nor did he ever see any visual depictions of the OCE.

## PROTECTIVE MEASURES SOUGHT

As set forth more fully below, there are substantial and well-founded concerns for the safety of the three undercover witnesses and their ability to engage in other undercover investigations if their true names were to be disclosed to the defense or at a public trial. In order protect from disclosure the undercover witnesses' true identities and physical characteristics, and the need to protect other undercover investigations and the government's undercover investigative procedures, the government respectfully requests that it be permitted to withhold from discovery the true identities of the three witnesses and that the Court impose certain security measures for the testimony of the witnesses at trial.

The proposed measures are narrowly tailored to assure that the identities and security of the undercover witnesses and the integrity of other undercover investigations will not be compromised by their appearances as witnesses at trial, without impairing the defendant's fair trial rights under the Sixth Amendment. Specifically, the government requests the Court implement the following measures:

1. The undercover witnesses may testify at trial under pseudonyms, without publicly disclosing their true identities;

2. The defense shall be prohibited from asking any questions seeking personal identifying information from the undercover witnesses, including true name, address or place of birth;

3. The defense shall be prohibited from asking any questions about the undercover witnesses' participation in other past or pending investigations, ███████████████████████████████████████████████████████████████████;

4. The defense shall be prohibited from asking any questions regarding any FBI undercover program writ large to include training and operations;

5. The undercover witnesses may testify using a light disguise, such as changing their facial hair, hairstyle, or dress style;

6. No public disclosure of any audio or video recording, or similar reproduction of the voice or visual image of the undercover witnesses while testifying, shall be permitted;

7. The undercover witnesses shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom, shall be permitted to enter the courtroom and sit in the witness chair outside the presence of the jury and defendant, and shall be permitted to remain seated when sworn in; and

8. The Protective Order sought by this motion may only be modified through a written superseding order issued by this Court.[2]

## ARGUMENT

### A. The Requested Order Would Not Violate Russell's Rights Under the Confrontation Clause

The Confrontation Clause of the Sixth Amendment gives a defendant the right to confront and cross-examine the government's witnesses who testify against the defendant, but that right is

---

[2] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

not absolute. *See Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129, 132–34 (1968). The "elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier or fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig*, 497 U.S. at 846.

A defendant's right to confront witnesses against him means he must be given an "opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *Smith*, 390 U.S. at 132 (quotation marks omitted). But "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, . . . the witness's safety, or interrogation that is . . . only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A defendant does not have a right to cross-examine the witness "in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Nor may a defendant insist on disclosure of a witness's identity if doing so would expose the witness to danger or threaten "other legitimate interests in the criminal trial process," *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973), or when the information would not materially aid the defendant's ability to cross-examine the witness. *See United States v Roviaro*, 353 U.S. 53, 60-62 (1957) (defendant has no constitutional right to know the name of a confidential informant unless it would be "relevant and helpful to [his] defense … or is essential to a fair determination of a cause"); *Van Arsdall*, 475 U.S. at 679.

Courts have observed that "where there is a threat to the life of the witness, the right of the defendant to have the witness's true name, address, and place of employment is not absolute." *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (citing *United States v. Varelli*, 407

7

F.2d 735 (7th Cir. 1969)); *see also United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012) (holding that trial court did not abuse its discretion by permitting two government witnesses to testify under pseudonyms and precluding cross-examination into identifying information when the witnesses faced threats to their safety by MS-13 in El Salvador); *United States v. Zelaya*, 336 F. App'x 355, 357–58 (4th Cir. 2009) (holding that trial court did not abuse its discretion by permitting two government witnesses from El Salvador to testify under pseudonyms and precluding cross-examination into identifying information when the witnesses faced threats to their safety); *Clark v. Ricketts*, 958 F.2d 851, 855 (9th Cir. 1991) (holding that the defendant's confrontation rights were not violated when government's John Doe witness testified under alias and without revealing his home address); *United States v. Contreras*, 602 F.2d 1237, 1238–40 (5th Cir. 1979) (where there was reasonable fear the disclosure of DEA agent's home address and frequented locations would endanger him and his family, no error in precluding cross-examination as to home address and other background information even though agent was "instrumental in defendant's arrest"); *Brown v. Kuhlmann*, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name).

The Fourth Circuit has approved the use of pseudonyms and the withholding of witnesses' identifying information where there are concerns about the witnesses' safety. *See Ramos-Cruz*, 667 F.3d at 500; *Zelaya*, 336 Fed. App'x at 357–58. In *Ramos-Cruz*, the trial court allowed two government witnesses to testify under pseudonyms and without revealing their names, home and work addresses, or dates and places of work. *Ramos-Cruz*, 667 F.3d at 500. In upholding the trial court's decision, the Fourth Circuit found that "because 'the government disclosed to the defense details of these two witnesses' before the trial, the defendants were able to 'effectively cross-

examine the witnesses without threatening their safety.'" *Id*. at 501 (quoting *Zelaya*, 336 Fed. App'x at 357–58). The Fourth Circuit also agreed with the D.C. Circuit that the "appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant, or from another source." *Ramos-Cruz*, 667 F.3d at 501 (quoting *United States v. Celis*, 608 F.3d 818, 832 (D.C. Cir. 2010).

This Court, as well as numerous other trial courts, likewise have approved alias testimony and restricted cross-examination in similar contexts where disclosure of a testifying witness's real identity would endanger the safety of the witness or create national security concerns. Just last year, Judge Gallagher of this Court approved measures nearly identical to those requested here to protect the true identity of an FBI undercover employee when testifying at trial. *See United States v. Gabrielian,* Criminal No. SAG-22-0336, at ECF 65. *See also United States v. Abu Ali*, 395 F. Supp. 2d 338, 344 (E.D. Va. 2005) (permitting use of pseudonyms by witnesses who testified during a pre-trial Rule 15 deposition that was conducted via satellite real-time video from Saudi Arabia to the federal courthouse); *United States v. Mohamud*, 941 F. Supp. 2d 1303, 1317–18 (D. Or. 2013) (holding that "the defense had adequate material to conduct a meaningful cross-examination" where undercover employees testified under pseudonyms and the government provided "information about the UCEs' background, training, and experience, as well as extensive recordings of their interactions with [the defendant]"); *United States v. Endris*, Case No. 1:15-CR-44-LMB, ECF No. 33 (E.D. Va. Mar. 13, 2015) (permitting a confidential source to testify in a gun case under a pseudonym and precluding the defense from possessing personal identifying information); *United States v. Neuner*, Case No. 4:12-CR-050-A, 2014 WL 4493631, at *2 (N.D. Tex. Sept. 11, 2014) (permitting an FBI undercover officer to testify under a pseudonym in a gun case); *United States v. Dumeisi*, Case No. 03-cr-664, ECF No. 83 at 1 (N.D. Ill. Jan. 2, 2004)

9

(permitting government witness to testify under a pseudonym and appear in light disguise, and prohibiting questioning about the witness's current or former address).

The use of pseudonyms for the three undercover witnesses is appropriate in this case. In the age of social media, an image or name can easily be publicly searched for the true identifying information of a CHS or OCE. In this case in particular, there is an acute concern that the CHSs and the OCE will be subject to harassment and the threat of violence if their true identities are disclosed. As explained by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮


11



████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

Balanced against these law enforcement and witness safety interests, the protective measures sought by the government to safeguard the undercover witnesses' true identities would not prejudice the defendant's confrontation rights. Because Russell has known the three witnesses only by their online aliases and has never seen any of them in person or in any photograph or video, withholding their true identities would not detract from the substance of the questioning on cross-examination. The witnesses will be present in the courtroom, so Russell will be able to confront them in keeping with his Sixth Amendment right to confront the witnesses against him. *See, e.g.*, *Ramos-Cruz*, 667 F.3d at 501. The jury, moreover, will be able to observe and assess their demeanor while testifying, even with a screen that protects the undercover witnesses from public view during trial or if they testify wearing a light disguise.

The true identities of the undercover witnesses are also not relevant to the witnesses' credibility or the defendant's ability to fully and fairly cross-exam them at trial. Each of the undercover witnesses' testimony will consist of a description of online conversations with Russell and relevant chats, online postings and comments made by Russell that they personally observed. All of those online communications were captured by the witnesses in the form of screenshots or computer captures; images that the government expects to introduce into evidence. CHS #1 will also testify about his voice conversations with Russell and Clendaniel, all of which were recorded

and will be offered into evidence as well. Accordingly, the undercover witnesses' testimony will not hinge on their credibility in any way, because the conversations and online communications with Russell and Clendaniel are objectively verifiable. The defendant would gain nothing relevant or beneficial if he were permitted to cross-examine the undercover witnesses about personally identifying information or ongoing investigations with which one or more of the witnesses may be involved. And, of course, the government will conduct its standard *Giglio* checks before trial and disclose any impeachment information to the defense in accordance with the government's discovery obligations, subject to the proposed restrictions.

**B.  The Court Should Preclude Discovery of the Undercover Witness' True Names and Identifying Information**

*Brady v Maryland*, 373 U.S. 83 (1964), and its progeny require the government to provide to the defense any evidence favorable to the accused and material to guilt or punishment. This principle extends to evidence bearing on government witnesses' credibility, including impeachment material. *Banks v. Dretke*, 540 U.S. 668, 700–02 (2004); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153–55 (1972). In this case, the undercover witness' true names and identifying information are not exculpatory. And, as explained above, the witnesses' anticipated testimony involves recorded conversations and online conversations and postings that were captured in screen shots or by computer. Information about the witness' true identities would not assist Russell in impeaching the witnesses' testimony in any way. Additionally, as indicated above, the government will conduct its standard *Giglio* checks before trial and disclose any impeachment information to the defense in accordance with the government's discovery obligations, subject to the proposed restrictions.

Under Federal Rule of Criminal Procedure 16 and this Court's Standing Order on Discovery, specific categories of information or materials are subject to disclosure, including

government witnesses' prior statements under the Jencks Act. Discoverable evidence under Rule 16 includes any document or object in the government's possession that is "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Rule 16(d)(1) also provides that a district court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. Fed. R. Crim. P. 16(d)(1).

In this case, there is good cause to restrict discovery by permitting the use of the undercover witness' pseudonyms—the names by which Russell knew them—and by restricting disclosure of information relating to their true identities. As already indicated, the government intends to provide the defense with any *Giglio* information and it has already provided the defense with copies of the recordings and the online communications about which the witnesses will testify. While the government also fully intends to comply with its obligations under the Jencks Act, the witnesses' true names and identifying information are not prior statements, nor would their disclosure affect any of the witnesses' prior statements that will be provided to the defense. Accordingly, there is good cause to limit discovery to ensure the safety of the witnesses.

Finally, the government notes that the reasons set forth in the defendant's earlier Motion to Compel Disclosure of Confidential Participants (ECF 64) are wholly inapplicable to the circumstances here.[3] The defendant argued in that motion that pursuant to *Rovario v. United States*, 353 U.S. 53 (1957) and its progeny, he was entitled to know the true identity of CHS #1, because CHS #1 was a participant in the criminal conspiracy. *Rovario* and the other cases cited

---

[3] The government did not have an opportunity to respond to the defendant's motion before the Court issued its ruling during the status conference that was held one week after the motion was filed. In any event, the government could not have responded at that time without disclosing the existence of its *Ex Parte* Motion for an Order Permitting Delayed Production of Certain Discovery, and thereby endangering the safety of witnesses.

by the defendant, however, involved situations where the government did not intend to call the informant as a witness at trial, and the defendant claimed that he was entitled to know the informant's identity because his testimony might be relevant and helpful to the defense. As the Supreme Court concluded in *Rovario*, "[t]he desirability of calling John Doe as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide." *Id.* at 629.

In marked contrast, the government in this case intends to call all three undercover witnesses at trial. None of the constitutional or fairness issues raised in the *Rovario* line of cases, therefore, are implicated here. As with any other government witness, the defendant will have a full opportunity to confront and cross-examine the undercover witnesses at trial.

## **CONCLUSION**

Disclosing the true identities of the three undercover witnesses in this case would pose a serious risk to the safety of the witnesses and undermine their ability to participate in other investigations. Allowing them to testify under pseudonyms and implementing the other requested security measures would not infringe on the defendant's constitutional rights nor would such measures negatively impact the defendant's right to discovery pursuant to *Brady*, the Jencks Act or Rule 16.

For the foregoing reasons, the government respectfully requests that this Court permit the government to withhold the true identities and personal identifying information of the undercover witnesses from discovery and that it allow the undercover witnesses to testify under

the protective conditions set forth in the proposed Protective Order.

              Respectfully submitted,

              Erek L. Barron
              United States Attorney

By: _____
              Kathleen O. Gavin
              Michael F. Aubin
              Assistant United States Attorneys
              36 South Charles Street
              Fourth Floor
              Baltimore, Maryland 21201
              (410) 209-4800

              *FILED VIA ECF/CM*