IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | **CRIMINAL NO. JKB-23-0056** |
| : | |
| **SARAH BETH CLENDANIEL,** : | |
| Defendant. : | |
| : | |
| : | |

...oOo...

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its undersigned attorneys, submits this memorandum in connection with the sentencing of the defendant, Sarah Beth Clendaniel.

## PROCEDURAL BACKGROUND

On February 14, 2023, the grand jury returned a one count Indictment against the defendant and co-defendant, Brandon Clint Russell, charging them with conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a). On April 23, 2024, pursuant to a plea agreement, the defendant entered a plea of guilty to a Superseding Information in which she was charged with one count of conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a) and one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1).

The defendant is scheduled to appear for sentencing at 10:00 a.m. on September 25, 2024.

## ARGUMENT

If we could do all these in a day …It would completely destroy this whole city… You know, what I'm talkin' about doin' … we need to make sure we destroy those cores, not just leak the oil … a good four or five shots like through the center of 'em …should suffice; like should, you know, make that happen …Like it would pro…, probably permanently

1

completely lay this city to waste … if we could… if we could do that successfully…Like this is like big tier like n…nothin' like this big has ever been accomplished.

Transcript of Recorded Call, dated 1/29/23, attached as Exhibit 1, at 46-47. This is how defendant Clendaniel described the intent and purpose of the conspiracy, as well as the specifics of the actual plan, to attack multiple transformers at electrical substations that were located in "a ring around Baltimore." *Id.* As her own chilling and brutal words make undeniably clear, Clendaniel and her co-conspirator, Brandon Russell, intended to cause massive economic losses and a "cascading failure" of the electrical grid that would "permanently completely lay this city to waste." *Id.* at 47-48.

      I.      <u>The Advisory Guideline Calculations.</u>

The only advisory guideline in dispute is the amount of the intended or attempted loss in connection with the conspiracy charged in Count One of the Superseding Information. *See* Plea Agreement, ECF 93, at 5, ¶ 6.b. The defendant has stipulated that the intended loss was at least $100,00, which would translate to an 8-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(E). The government's position, as set forth in more detail below, is that the amount of intended loss was $75 million, which would add 24-levels to the guideline calculation.[1]

           A.      The Intended Loss Amount is at Least $75 Million Within the Meaning of <u>U.S.S.G. § 2B1.1(b).</u>

Section 2B1.1of the Advisory Sentencing Guidelines provides that the determination of loss for purposes of calculating the guideline level "is the greater of actual loss or intended loss."

---

[1] The presentence report incorrectly states that if the Court were to find that the loss exceeded $250,000, the total offense level would be 30. PSR at ¶ 121. The plea agreement expressly provides that "the parties do not agree how many levels must be added based on the total amount of intended loss" and that "[b]oth parties reserve the right to present evidence of the intended loss at the sentencing hearing." ECF 93 at 5, ¶ 6.b.

2

U.S.S.G. § 2B1.1, App. Note 3(A).[2]  The Commentary further defines "intended loss" to mean "the pecuniary harm that the defendant purposely sought to inflict; and … includes intended pecuniary harm that woud have been impossible or unlikely to occur (*e.g.* as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value").  App. Note 3(A)(ii).  The Commentary also states that "'[p]ecuniary harm' means harm that is monetary or that is otherwise readily measurable in money." App. Note 3(A)(iii).  As set forth below, and as will be presented in further detail at the sentencing hearing, the intended loss in this case was at least $75 million.

In January 2023, Clendaniel identified to Confidential Human Source ("CHS #1") the five substations that they would attack and she discussed with CHS #1 the specific type of rifle and ammunition that she wanted CHS #1 to obtain for her to use in the planned attacks.  Based on that information, the government identified the precise distances from the exterior fence to the transformers at each of the five substations, as well the composition and thickness of the walls of each transformer. A terminal ballistics expert, who is expected to testify at the sentencing hearing, analyzed that information and determined to reasonable degree of scientific certainty that the bullets would have successfully pierced the walls of the targeted transformers at four of the five locations. *See* Report of Denver Gallardy, attached as Exhibit 2.

According to the Senior Manager in the Substation Engineering Design and Standards Department of Baltimore Gas and Electric, who is also expected to testify at the sentencing, piercing the wall of a transformer with a bullet or bullets would cause a complete failure of the

---

[2] The Fourth Circuit just recently affirmed that it is appropriate to rely upon the Commentary in order to calculate an intended loss for purposes of U.S.S.G. § Section 2B1.1. *United States v. Boler,* No. 23-4352, ___ F.4th___, 2024 WL 3908554 (4th Cir. Aug. 23, 2024).

transformer. And even if a bullet did not actually penetrate the wall, but its impact caused fragments of metal to come loose on the interior of the wall, the unit still would completely fail.[3] In either case, the transformer would have to be replaced, because "there is no ability to repair the inner core and components of a transformer." BGE Damage Assessment Report by Patrick Carberry, attached as Exhibit 3, at 1.

The material cost to obtain new transformers for the substations, as set forth in Mr. Carberry's report, would have been about $75 million. *Id*. at 3.[4] This $75 million loss figure, however, is an extremely conservative estimate of the total intended loss in this case. It only includes the actual cost to purchase the new transformers and does not include installation and other project-related costs that BGE would have incurred. It also does not include the obvious extensive economic losses that the residents, businesses, hospitals and countless other entities served by those substations would have experienced due to the loss of power for an extended period of time. As Clendaniel herself stated, it was her intent to cause a "cascading failure" and that "[i]f we can pull off what I'm hoping … this would be legendary. This is MAJOR tier and definitely doable." Plea Agreement, ECF 93, at 13.

For these reasons, the government submits that the Court should find that the intended loss was *at least* $75 million and that the offense level should be increased by 24 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

---

[3] This is known as "spalling" and is defined as "the fragmentation of metal on the reverse side of a piece of material struck by a projectile." Exhibit B at 1.

[4] Mr. Gallardy's conclusion that the walls of the transformers at one of the substations would not have been penetrated by the bullets has no bearing on this loss calculation. As the Commentary to U.S.S.G.§ 2B1.1 makes clear, it is the intent of the defendant to cause the loss that is relevant to the calculation. The fact that, in the end, the defendant would not succeeded in actually destroying the transformers at that particular substation does not change the intended loss calculation. App. Note 3(A)(ii).

B.  The Final Adjusted Guideline Calculations.

If the Court agrees that the intended loss was at least $75 million, the final adjusted guideline calculations should be as follows:

1. Count One – Conspiracy to Damage an Energy Facility

    +7    base offense level (U.S.S.G. §2B1.1(a)(1)(B))

    +2    conscious or reckless risk of death or serious injury (U.S.S.G. § 2B1.1(b)(16)(A))

    +22   intended loss more than $65 million ((U.S.S.G. § 2B1.1(b)(1)(M))

    +15   felony that involved terrorism or intended to promote terrorism (U.S.S.G. § 3A1.4(a))
    _____
    48    total

2. Count Two – Possession of Firearm by Prohibited Person

    +24   possession after sustaining two felony convictions for crime of violence (U.S.S.G. § 2K2.1(a)(2)) [5]
    _____
    24    total

3. The offenses do not group, because they are not closely related. U.S.S.G. § 3D1.1 and 2. Because the guideline level for Count Two is more than 9 levels lower than the level for Count One, the combined offense level is 48. U.S.S.G. § 3D1.4.

4. The offense level is reduced by three levels for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

---

[5] In her response to the initial presentence report, the defendant objected to the probation officer's calculation of points for some of her previous convictions, arguing that they did not qualify as "crimes of violence." The defendant acknowledged, however, that the dispute is purely an academic one, because her criminal history category is automatically VI due to the application of the terrorism enhancement pursuant to U.S.S.G. § 3A1.4(a).

The final adjusted offense level, therefore, is 45. The maximum offense level under the advisory guidelines is level 43. With a Criminal History Category VI, the range at that level, and therefore for a level 45 as well, is life imprisonment.[6]

## II. The Section 3553(a) Factors.

A sentence of imprisonment of 18 years is warranted in this case. Such a sentence would be sufficient, but not greater than necessary, to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) while taking into consideration the history and characteristics of the defendant.

### A. The Nature and Circumstances of the Offenses

Clendaniel is an admitted "accelerationist" who believes that violent action is required in order to bring about societal and government collapse and advance a white supremacist ideology. Plea Agreement, ECF 93, at 10. She engaged in the conspiracy to attack critical infrastructure in Maryland in furtherance of that accelerationist goal. If not thwarted by law enforcement, Clendaniel and her co-conspirator would have permanently destroyed a significant portion of the electrical infrastructure around Baltimore which, in turn, would have caused extensive economic harm and created a significant risk to the safety, health and well-being of countless Maryland residents. Indeed, a massive, unexpected loss of electrical power for an extended period of time likely would have led to the deaths of one or more persons with serious medical conditions who depended on electronic medical devices to keep themselves alive at home.

---

[6] The statutory maximum penalty for a violation of 18 U.S.C. § 1366, however, is twenty years of imprisonment and the maximum for a violation of 18 U.S.C. § 922(g) is 15 years of imprisonment.

Moreover, this is not a case in which the defendant engaged in a singular criminal act committed out of desperation, impulse or the exercise of poor judgment. Rather, Clendaniel deliberately and methodically planned the attacks over a period of months. Over a significant period of time, Clendaniel and Russell, her co-conspirator, planned and calculated the details of the attacks and enlisted the aid of CHS #1 to help them execute the attacks. Clendaniel engaged in multiple communications with CHS #1 in which she discussed the details of the planned attacks and her ultimate goal of "lay[ing] waste" to Baltimore. Exhibit 1 at 46-47.

Clendaniel researched the type of firearm and ammunition that she wanted CHS #1 to obtain for her, as well as various firearm accessories. Clendaniel researched the locations of the substations and discussed the merits of one or more of them separately with co-conspirator Russell and with CHS #1. Exhibit 4, at 3-7; Exhibit 5, at 131-32. She told CHS #1 that they would need to physically "scope it out," meaning that they should visit the targeted substations in person at least a week before they attacked. Exhibit 5, at 135. She emphasized to CHS #1 that they needed to shoot the transformers through their cores in order to create maximum damage and that they should obtain some "incendiary rounds" to use in the attacks "just to make sure it's a solid thing and not just like the oil leaking out but like it's fully damaged." Plea Agreement, ECF 93, at 13.

Clendaniel also extensively discussed with CHS #1 various ways in which they would be able to evade detection by law enforcement. She told CHS #1 that they needed "brass catchers" to ensure that they did not leave any shell casings behind. Clendaniel further explained to CHS #1 that she wanted to gather spent casings from different types of weapons from a firing range so that they could then scatter the casings around the substations at the time of the attacks in order to send law enforcement personnel "on like a 'wild goose chase' and have them fuckin' runnin' around looking for somethin' else ….It'll take up more resources." Exhibit 5, at 122-24.

7

In addition, Clendaniel told CHS #1 that she planned to file the serial number off the rifle that he would purchase for her or that he could report it stolen so that authorities could not connect the attacks to his purchase of the rifle. *See* Transcript of Recorded Call, dated January 18, 2023, attached as Exhibit 4, at 36-38; Transcript of Recorded Call, dated January 24, 2023, attached as Exhibit 5, at 126. She also talked to CHS #1 about obtaining different vehicles that they could use to drive to the various substations as a way to evade law enforcement. Exhibit 1, at 54-63.

As for her possession of a firearm, the defendant's complete disregard for the law and cavalier attitude is clearly reflected in her recorded conversations with CHS #1. In addition to the fact that she openly sought an AR-10 rifle and ammunition from CHS #1 in order to carry out the attacks, Clendaniel told CHS #1, among other things, the following:

- It would be "a terrible situation where like I got pulled over because.., you know what I mean.. like I'm already drivin'.., I'm anxious and fuckin' do something dumb.., get pulled over and …I'm a felon with a fuckin' firearm in the …in the car," Exhibit 4, at 10;

- She had someone print an AR firearm for her while she was still serving her prison sentence and in a halfway house, *Id.* at 43-44, 48;

- She wanted CHS #1 to get a silencer for her Glock 9; *Id.* at 46;

- She did not care whether CHS #1 printed or bought the AR-10 rifle for her, because "it's all illegal for me so it doesn't matter," *Id.* at 49;

- Several months before she began talking to CHS #1, Clendaniel took her then 14 year old son, her son's friend and her 19 year old "autistic" nephew onto a neighbor's wooded property near her house in order to teach them how to shoot her printed AR-10 rifle. Exhibit 5, at 50-54, 62, 67-68, 117-18. At the time, she wore "a chest rigged with like fifteen magazines, [her] pistol in a drop holster like down the side of [her] leg and this …rifle that like [she is] short.., this.. it was twenty inch barrel."[7] *Id.* at 51;

---

[7] Later in the same conversation, Clendaniel told CHS #1 that she also had planned to teach her minor daughter how to shoot the pistol, but had discovered that the pistol, which she had previously fired, was inoperable at the time of this incident. She claimed that she was carrying it then for "training purposes." Exhibit 5, at 70-71, 75-76.

- She told CHS #1 that she had more than 150 rounds of ammunition, including ones she described as nine millimeter "full metal jacket" and "Hallow-Point [sic]." Exhibit 5, at 99-100; and

- She had a semi-automatic shotgun and contemplated purchasing "armor-piercing rounds" for it if she was unable to get a rifle. *Id*. at 101-102, 106.

In short, the nature and seriousness of Clendaniel's deliberate, ongoing and repeated criminal conduct is extraordinary. And if Clendaniel had succeeded in carrying out the plot, not only would the lives of thousands of Maryland residents have been severely impacted, the attacks would have caused losses in excess of $75 million dollars.

B.    The History and Characteristics of the Defendant

The presentence report provides a lengthy narrative of the defendant's extensive criminal history and events from her childhood. *See* PSR, at ¶¶ 55-82; 85-92, 101-113. There is nothing in that narrative, however, that warrants the imposition of a sentence that is less than 18 years of imprisonment in this case.

As already indicated above, the defendant engaged in a deliberate and calculated scheme to destroy critical infrastructure with the goal of creating societal chaos to further a white supremacist ideology. The fact that she had just recently served a lengthy term in prison following multiple convictions for violent crimes, including robbing a convenience store with a machete, plainly did not rehabilitate the defendant or deter her from continuing to engage in criminal conduct. Indeed, Clendaniel committed the very serious crimes in this case barely a year after her release from the halfway house in 2021. *See* PSR at ¶ 93. In fact, by her own admission, it was while she was in the halfway house, still serving her sentence, that Clendaniel made arrangements to have a firearm printed and ready for her upon her release. Exhibit 4 at 43-44, 48.

9

Quite simply, the defendant is an unrepentant, violent white supremacist and recidivist who is a true danger to the community. In light of her extensive criminal history, there is no reason to expect that a lighter sentence would have any deterrent or rehabilitative effect upon this defendant. A sentence of 18 years, which is two years below the statutory maximum for Count One and five years below the statutory maximum for Count Two, would recognize the nature and seriousness of the offenses as well as the defendant's background and characteristics. Equally important is the fact that such a sentence would protect the community from future crimes of the defendant for a significant period of time.

      C.      The Need for General Deterrence, Promote Respect for the Law and Impose Just Punishment.

A sentence of 18 years is also appropriate, because such a sentence will promote respect for the law, deter other potential offenders and impose a just punishment for a serious crime. 18 U.S.C. § 3553(a)(2)(A) and (B). The need for general deterrence is particularly acute in this case, because the online community of white supremacists and accelerationist adherents, here in this country as well as around the world, is closely following this prosecution. Imposing a sentence of 18 years of imprisonment would send a strong message to that particular community, as well as to the community at large, that this sort of violent and destructive conduct will not be tolerated and will be met with a serious penalty. *United States v. Milo*, 506 F.3d 71 (1st Cir. 2007) ("[T]he lack of any real prison sentence for what is a major crime would be very hard for the public to understand, and public confidence in enforcement of the law is itself a value").

## CONCLUSION

For the foregoing reasons, as well as for reasons that may be presented at the sentencing, the government respectfully requests that this Court sentence the defendant to a total of 18 years of imprisonment and a lifetime period of supervised release on the Superseding Information.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____
Kathleen O. Gavin
Michael F. Aubin
Assistant United States Attorneys

*Filed via ECF/CM*